UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                          )
    MIRIAM SANTIAGO           ) Case No.: 8:09-bk-01136-MGW
    PABLO TEODOLO LEGER       ) Chapter : 7
       Debtor               )
_____)

**MOTION SEEKING RELIEF FROM THE AUTOMATIC STAY
OF HSBC MORTGAGE SERVICES, INC.(WITH NEGATIVE NOTICE)**

> **NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING**
> Pursuant to Local Rule 2002-4, the Court will consider this motion , objection, or other matter without further notice or hearing unless a party in interest files an objection within 20 (twenty) days from the date of service of this paper.  If you object to the relief requested in this paper, you must file your objection with the Clerk of Court at 801 N. Florida Avenue, Suite 727, Tampa, Florida 33602, and serve a copy on the movant's attorney ENRICO G. GONZALEZ, 6255 E. Fowler Avenue, Temple Terrace, Florida 33617.
>
> If you file and serve an objection within the time permitted, the Court may schedule a hearing and you will be notified.  If you do not file an objection within the time permitted, the Court consider that you do not oppose the granting of the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief

Secured creditor, HSBC MORTGAGE SERVICES, INC., through its undersigned attorney, files this its Motion Seeking Relief from the Automatic Stay as to the debtors Miriam Santiago and Pablo Teodolo Leger,  and says:

1.   Debtors filed with this Court a Petition For Relief Under 11 USC Chapter 7 on January 23, 2009.

2.   This Motion Seeks Relief From The Automatic Stay concerning the following described property:

> LOT 419, LEGACY PARK-PHASE THREE, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 129, PAGES 10, 11 AND 12 OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.
> PARCEL ID NUMBER: 112526 486253 004190
> A/K/A 416 BRAYTON LANE, DAVENPORT, FLORIDA 33897

3.   This Motion Seeking Relief From The Automatic Stay results from the filing of the above petition which has precluded the movant from enforcing its security interest in certain real property of the debtors, said property not being claimed as exempt and is being surrendered as stated in the debtors Statement of Intention that was filed with this Court on January 23, 2009. The relief sought is to enforce liens against the property of the estate.  The property has not been abandoned by the Trustee.

4.   Debtors executed and delivered to movant a promissory note and mortgage securing payment of the note, a copy of the note, mortgage and affidavit being attached.

5.   Debtors are in default under the mortgage and note by failing to pay the monthly installments when due, the date of the last payment being March 1, 2008.

6.   There is presently due and owing to the movant the principal sum of $171,322.45, together with accruing interest, late charges, costs and attorney fees pursuant to the terms of the

promissory note.

7. That said property is not necessary to an effective reorganization.

8. The debtors have no equity in the above described property over and above the existing mortgages, the market value of same being in the amount of $193,027.00, pursuant to the appraisal on same, a copy of which is attached hereto.

9. The debtors failed to provide the moving party with adequate protection.

10. By virtue of the Automatic Stay, the movant will be irreparably harmed in that the property will continue to depreciate and be dissipated or otherwise decrease in value while remaining beyond the control and reach of the movant.

11. There are no co-debtors.

WHEREFORE, movant requests the Court to enter an Order pursuant to Section 362d, terminating or lifting the stay and awarding attorney fees and court costs.

I HEREBY CERTIFY that a true copy of the foregoing Motion Seeking Relief from the Automatic Stay along with attached exhibits have been furnished by Electronic and/or U.S. Mail to Miriam Santiago and Pablo Teodolo Leger, 3542 Somerset Circle, Kissimmee, FL 34746; Stanley J. Galewski, Esquire, 201 E. Kennedy Blvd, #760, Tampa, FL 33602; Chapter 7 Trustee, Beth Ann Scharrer, PO Box 4550,

Seminole, FL 33775-4550 and U.S. Trustee - TPA7, 501 E. Polk, Suite

1200, Tampa, FL 33602, this 5th of March, 2009

ENRICO G. GONZALEZ, P.A.
Attorney at Law

/s/ Enrico G. Gonzalez, Esquire
_____
ENRICO G. GONZALEZ, ESQUIRE
6255 East Fowler Avenue
Temple Terrace, FL  33617
Telephone No. 813/980-6302
Fax No. 813/980-6802
Florida Bar No. 861472
Attorney for Creditor

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

IN RE:                              )
    MIRIAM SANTIAGO                 ) Case No.: 8:09-bk-01136-MGW
    PABLO TEODOLO LEGER             ) Chapter : 7
        Debtor                  )
_____     )

## AFFIDAVIT IN SUPPORT OF MOTION SEEKING RELIEF
## FROM STAY AS TO HSBC MORTGAGE SERVICES, INC.

STATE OF Florida
COUNTY OF Hillsborough

    BEFORE ME, the undersigned authority, personally appeared

Peter O'Bryant_____, who is a Bankruptcy Specialist for HSBC

MORTGAGE SERVICES, INC. (hereinafter "HSBC"), and who after being

duly sworn deposes and says:

    1.    This affidavit is based upon loan account payment

records of HSBC.  These records are regularly maintained in the

course of business of HSBC, and it is the regular practice of

HSBC to make and maintain these records.  These records reflect

loan payments that are noted in the records at the time of

receipt by persons whose regular duties include recording this

information.  We have knowledge and/or access to the business

records of HSBC.

    3.    Debtors, Miriam Santiago and Pablo Teodolo Leger,

maintain the loan account number ██████ with HSBC, and the

loan represented by the account is secured by a security interest

on the following property:

> LOT 419, LEGACY PARK-PHASE THREE, ACCORDING TO THE PLAT
> THEREOF RECORDED IN PLAT BOOK 129, PAGES 10, 11 AND 12
> OF THE PUBLIC RECORDS OF POLK COUNTY, FLORIDA.
> PARCEL ID NUMBER: 112526 486253 004190
> A/K/A 416 BRAYTON LANE, DAVENPORT, FLORIDA 33897

4.   Debtors defaulted contractually on the payment of said contract, the date of last payment being March 1, 2008.   The debtors failed to make the next regular payment due on April 1, 2008 and all subsequent payments.   There is presently a balance due and owing in the amount of 171,322.45, together with accrued interest.   The loan represented by this account is secured by a Loan Repayment and Security Agreement, a copy of the same is attached hereto.

5.   This concludes my affidavit.

_____
AFFIANT

STATE OF Florida
COUNTY OF Hillsborough

Sworn to and subscribed before me this _2_ day of February 2009, by Peter O'Bryant , and she is personally known to me and who did take an oath.

_____
Notary Public
Name: Raquel Clark Lott
State of Florida
My Commission Expires

RAQUEL CLARK-LOTT
MY COMMISSION # DD 609689
EXPIRES: July 29, 2012
Bonded Thru Notary Public Underwriters

<u>Home</u> » <u>Return To Search Results</u>

## Parcel Details: 26-25-11-486253-004190

⊞ Portability Calculator  📷 Pic Report

### Owners

| | |
|---|---|
| SANTIAGO MIRIAM | 50% |
| LEGER TEODULO PABLO | 50% |

### Mailing Address

Address 1  **416 BRAYTON LN**

Address 2

Address 3  **DAVENPORT FL 33897-6242**

### Site Address

| | |
|---|---|
| Address 1 | **416 BRAYTON LN** |
| Address 2 | |
| City | **DAVENPORT** |
| State | **FL** |
| Zip Code | **33897** |

### Parcel Information

| | |
|---|---|
| Neighborhood | **110125.00** <br> <u>Show Recent Sales in this Neighborhood</u> |
| Subdivision | **LEGACY PARK - PHASE THREE** |
| Property (DOR) Use Code | **SFR up to 2.49 AC (Code: 0100)** |
| Acreage | **0.21** |
| Taxing District | **UNINCORP/GREEN SWAMP (Code: 80000)** |

### Legal Description

LEGACY PARK - PHASE THREE PLAT BOOK 129 PGS 10 THRU 12 LOT 419

### Area Map



### Recorded Plat

<u>Visit the Polk County Clerk of Courts website to view the Recorded Plat for this parcel</u>

Note: Some plats are not yet available on the Clerk's website.  The site contains images of plats recorded on 01/05/1973 (beginning with book 058 Page 020) or later.  For information on Plats recorded before 01/05/1973 (Book 058 Page 019 or less) please contact the <u>Polk County Clerk's Office.</u>

### Mapping Worksheets (plats) for 262511

<u>Mapping Worksheet Info</u>

<u>rcover.pdf</u>

<u>s486251.pdf</u>

<u>se.pdf</u>

<u>sw.pdf</u>

<u>thatpartlyinginsec11.pdf</u>



## Sales History

| OR Book/Page | Date | Type Inst | Vacant/ Improved | Reason | Grantee | Sales Price |
|---|---|---|---|---|---|---|
| 6576/1367 | 12/2005 | W | I | 00 | SANTIAGO MIRIAM | $214,400 |
| 6092/1525 | 02/2005 | W | V | 02 | COLONY COMMUNITIES | $3,769,500 |
| 5244/1988 | 01/2003 | W | V | 02 | LEGACY PARK VENTURE LLLP | $5,965,900 |
| 2933/0391 | 12/1990 | Q | V | 01 | | $100 |
| 2682/0626 | 07/1988 | Q | V | 01 | | $100 |
| 1705/2172 | 08/1976 | W | E | 02 | | $950,000 |

## Exemptions

**Note:** The drop down menus below provide information on the amount of exemption applied to each taxing district. The HX—first $25,000 homestead exemption may be allocated to one or more owners. The HB –second $25,000 amended homestead exemption reflects the name of the first owner only.

| Code | Description | % Ownership | Year | Name | Value |
|---|---|---|---|---|---|
| | | | | | |

## Buildings

### BUILDING 1 (Single Family)

#### Building Characteristics

**Total Under Roof:** 2,366 sqft
**Living Area (as originally constructed):** 1,925 sqft
**Actual Year Built:** 2005
**Effective Year:** 2005

**416 BRAYTON LN**



| Element | Units | Information |
|---|---|---|
| Style | | SINGLE FAMILY |
| Living Units | | 1 UNIT |
| Story Height Info Only | | 1 Story for info only |
| Substruct | | Concrete Wall |
| Construction Type | | MASONRY |
| Exterior Wall | | STUCCO |
| Roof Structure | | GABLE-SHINGLE |
| Room: Bedroom | 4 | |
| Room: Full Bath | 2 | |
| Room: Half Bath | 0 | |
| Fireplace | N | |
| Cntrl Heating / AC | Y | |

#### Building Subareas

| Code | Description | Total |
|---|---|---|
| BAS | BASE AREA | 1925 |

| | | |
|---|---|---:|
| UGR | UGR UNFINISHED GARAGE 50% | 420 |
| UOP | UOP UNFIN. OPEN PORCH 30% | 21 |
| **Total Under Roof** | | **2,366 ft²** |

## Land Lines (Current)

| LN | Land Dscr | Ag/GreenBelt | Land Unit Type | Front | Depth | Units |
|---|---|---|---|---|---|---|
| 1 | * Residential | N | U | 0 | 0 | 1 |
| | * for current use NOT Future Land Use | | | | | |

> All above information is current (as of Thursday, March 05, 2009 at 2:25:34 AM). All below information is 2008 Final, except where otherwise noted.

## Value Summary (2008 Final)

| Desc | Value |
|---|---:|
| Total Land Value | $40,000 |
| Total Building Value | $153,027 |
| Total Extra Features Value | $0 |
| Land Classified Value | $0 |
| Just Market Value | $193,027 |
| Save our Homes Deferred | $0 |
| Agriculture Classification | $0 |
| Total Assessed Value | $193,027 |

## Taxable Value (2008 Final)

| District Description | Tax Rate | Assessed Value | Assessed Taxes | Exemption | Tax Savings | Taxable Value | Taxes |
|---|---|---|---|---|---|---|---|
| Board Of County Commissioners - GF | 6.806500 | $193,027 | $1,313.84 | $0 | $0.00 | $193,027 | $1,313.84 |
| Polk County Parks MSTU | 0.421900 | $193,027 | $81.44 | $0 | $0.00 | $193,027 | $81.44 |
| Polk County Library MSTU | 0.210900 | $193,027 | $40.71 | $0 | $0.00 | $193,027 | $40.71 |
| Polk County School Board - State | 5.136000 | $193,027 | $991.39 | $0 | $0.00 | $193,027 | $991.39 |
| Polk County School Board - Local | 2.498000 | $193,027 | $482.18 | $0 | $0.00 | $193,027 | $482.18 |
| South West FLA Water Mgmt Dist | 0.386600 | $193,027 | $74.62 | $0 | $0.00 | $193,027 | $74.62 |
| Board Of County Commissioners - | 0.060000 | $193,027 | $11.58 | $0 | $0.00 | $193,027 | $11.58 |

DS

| | Assessed Taxes: | $2,995.76 | Tax Savings: | $0.00 | Total Taxes: | $2,995.76 |
|---|---|---|---|---|---|---|

## Non-Ad Valorem Assessments (2008 Final)

| LN | Code | Desc | Assessment |
|---|---|---|---|
| 1 | FI000 | POLK COUNTY FIRE SERVICES | $148.00 |
| 2 | SW001 | POLK COUNTY SOLID WASTE | $125.41 |
| 3 | SW001 | POLK COUNTY SOLID WASTE | $49.09 |
| **Total Assessments** | | | **$322.50** |

## Taxes

| Desc | Last Year | 2008 Final |
|---|---|---|
| Taxing District | UNINCORP/GREEN SWAMP (Code: 80000) | UNINCORP/GREEN SWAMP (Code: 80000) |
| Millage Rate | 15.3979 | 15.5199 |
| Ad Valorem Assessments | $2,934.19 | $2,995.76 |
| Non-Ad Valorem Assessments | $322.50 | $322.50 |
| **Total Taxes** | **$3,256.69** | **$3,318.26** |

**Your final tax bill may contain Non-Ad Valorem assessments which may not be reflected on this page, such as assessments for roads, drainage, garbage, fire, lighting, water, sewer, or other governmental services and facilities which may be levied by your county, city or any other special district. Visit the Polk County Tax Collector's site for Tax Bill information related to this account. Use the Property Tax Estimator to estimate taxes for this account.**

## Prior Year Final Values

### 2007

| | |
|---|---|
| Land Value | $40,000.00 |
| Building Value | $150,558.00 |
| Misc. Items Value | $0.00 |
| Land Classified Value | $0.00 |
| Total Just Value (Market) | $190,558.00 |
| SOH Deferred Val | $0.00 |
| Agriculture Classification | $0.00 |
| Assessed Value | $190,558.00 |
| Exempt Value | $0.00 |
| Taxable Value | $190,558.00 |

### 2006

| | |
|---|---|
| Land Value | $26,500.00 |
| Building Value | $135,420.00 |
| Misc. Items Value | $0.00 |
| Total Just Value (Market) | $161,920.00 |
| SOH Deferred Val | $0.00 |
| Assessed Value | $161,920.00 |
| Exempt Value | $0.00 |
| Taxable Value | $161,920.00 |

**2005**

| | |
|---|---|
| Land Value | $19,200.00 |
| Building Value | $0.00 |
| Misc. Items Value | $0.00 |
| Total Just Value (Market) | $19,200.00 |
| SOH Deferred Val | $0.00 |
| Assessed Value | $19,200.00 |
| Exempt Value | $0.00 |
| Taxable Value | $19,200.00 |

## DISCLAIMER:
The Polk County Property Appraiser makes every effort to produce and publish the most current and accurate information possible. The PCPA assumes no responsibility for errors in the information and does not guarantee that the data are free from errors or inaccuracies. Similarly the PCPA assumes no responsibility for the consequences of inappropriate uses or interpretations of the data. No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation. Utilization of the search facility indicates understanding and acceptance of this statement by the user.

Last Updated: Thursday, March 05, 2009 at 2:25:34 AM

INSTR # 2006004287
BK 06576 PGS 1368-1391 PG(s)24
RECORDED 01/06/2006 10:26:17 AM
RICHARD M WEISS, CLERK OF COURT
POLK COUNTY
MTG DOC 600.25
INTANG TAX 342.88
RECORDING FEES 205.50
RECORDED BY N Payne

Return To:
Wilmington Finance, a division of AIG Federal Savings Bank
401 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462

This document was prepared by: *Adam Smith*
Wilmington Finance, a division of AIG Federal Savings Bank
One Hanover Park, # 250 16633 N Dallas Pkwy
Addison, TX 75001

*RETURN TO:*
*Pohl & Short, P.A.*
*FRANK L. POHL, ESQUIRE*
*280 W. Canton Avenue, Ste. 410*
*Winter Park, FL 32789*
*File No. (407) 425-3510*

―――――――――――[Space Above This Line For Recording Data]―――――――――――

# MORTGAGE

Loan Number: ▮▮▮▮▮                                    MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated December 20, 2005
together with all Riders to this document.
**(B) "Borrower"** is *Teodulo Pablo Leger* ∇⁰¹.
MIRIAM SANTIAGO AND ~~PABLO LEGER~~, WIFE AND HUSBAND

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is
Wilmington Finance, a division of AIG Federal Savings Bank

**FLORIDA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**            Form 3010  1/01

(VMP) -6A(FL) (0005).01
Page 1 of 16            Initials: ▮▮ . ∇⁰¹ -
     VMP MORTGAGE FORMS - (800)521-7291
DDS-VFL



Lender is a Federal Savings Bank
organized and existing under the laws of United States of America
Lender's address is 401 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462

(E) "Note" means the promissory note signed by Borrower and dated December 20, 2005
The Note states that Borrower owes Lender One Hundred Seventy-One Thousand Four Hundred
Forty-Two & 00/100                                                                  Dollars
(U.S. $171,442.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than January 01, 2036

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:

-6A(FL) (0005).01                                Page 2 of 16                                Form 3010   1/01
DDS-VFL

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the      County      [Type of Recording Jurisdiction]
of                                   POLK                          [Name of Recording Jurisdiction]:

Lot 419, LEGACY PARK - PHASE THREE, according to the Plat thereof recorded in Plat Book 129, Pages 10, 11 and 12 of the Public Records of Polk County, Florida.

Parcel ID Number: 112526-486253-004190                which currently has the address of
416 BRAYTON LANE                                                                        [Street]
DAVENPORT                                              [City], Florida      33897-      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of h2ose interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Initials:

-6A(FL) (0005).01                          Page 3 of 16                                Form 3010   1/01
DDS-VFL

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

Initials:

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

Initials: _____

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Initials:

VMP®-6A(FL) (0005).01
DDS-VFL

Page 6 of 16

Form 3010  1/01

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Initials:

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: _____

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: _____

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

Initials: _____

-6A(FL) (0005).01                          Page 10 of 16                          Form 3010   1/01
DDS-VFL

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

Initials: _____

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

Initials: _____

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Initials:

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Initials:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

*Michelle L. Corn*
Michelle L. Corn

DEC 2 0 2005

_____ (Seal)
                          -Borrower
MIRIAM SANTIAGO

*Bianca Ortiz*
BIANCA ORTIZ

_____ (Address)

DEC 2 0 2005

_____ (Seal)
                          -Borrower
Teodulo Pablo Leger
PABLO LEGER

416 Brayton Lane
Davenport, FL 33897    (Address)

_____ (Seal)       _____ (Seal)
                          -Borrower                               -Borrower


_____ (Address)    _____ (Address)


_____ (Seal)       _____ (Seal)
                          -Borrower                               -Borrower


_____ (Address)    _____ (Address)


_____ (Seal)       _____ (Seal)
                          -Borrower                               -Borrower


_____ (Address)    _____ (Address)

STATE OF FLORIDA,

The foregoing instrument was acknowledged before me this ~Orange~ County ss: December 20, 2005 by

Miriam Santiago & Teodulo Pablo Leger

~who is personally known to me or~ who has produced Driver's License as identification.

Michelle L. Corn

Notary Public

Michelle L. Corn
My Commission DD342045
Expires September 24, 2008

Initials:

# ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

Loan Number: ▮▮▮▮▮▮

THIS ADJUSTABLE RATE RIDER is made this     20th     day of     December, 2005     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
Wilmington Finance, a division of AIG Federal Savings Bank,
Federal Savings Bank
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

416 BRAYTON LANE
DAVENPORT, FL 33897-
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of     7.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of     January, 2008     , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

WILMINGTON - MODIFIED
**MULTISTATE ADJUSTABLE RATE RIDER (LIBOR Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT**

(VMP)-815R (0008)          Form 3192 1/01
Page 1 of 4             Initials: ▮▮▮
VMP MORTGAGE FORMS - (800)521-7291

DDS-GAO

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN AND 740/1000                     percentage points (          7.740%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than         10.990 % or less than                     7.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than         13.990 %, or less than 7.990%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

Initials: _____

VMP-816R (0008)                     Page 2 of 4                     Form 3192 1/01

DDS-GAO

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials:

-815R (0008)                    Page 3 of 4                    Form 3192 1/01

DDS-GAO

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
-Borrower

MIRIAM SANTIAGO

_____ (Seal)
Teodulo Pablo Leger                    -Borrower
PABLO LEGER

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

VMP-815R (0008)                    Page 4 of 4                    Form 3192 1/01

DDS-GAO

# PLANNED UNIT DEVELOPMENT RIDER

Loan Number:

THIS PLANNED UNIT DEVELOPMENT RIDER is made this                20th                day of December, 2005                          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
Wilmington Finance, a division of AIG Federal Savings Bank

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

416 BRAYTON LANE
DAVENPORT, FL 33897·
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

THE DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS.
(the "Declaration"). The Property is a part of a planned unit development known as

LEGACY PARK
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150 1/01**

Page 1 of 3          Initials: _____

VMP®-7R (0411)          VMP Mortgage Solutions, Inc. (800)521-7291
DDS-C07

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

VMP®-7R (0411)                     Page 2 of 3                     Form 3150 1/01
DDS-C07

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_Miriam Santiago_     DEC 2 0 2005       (Seal)
_____ (Seal)
MIRIAM SANTIAGO          -Borrower

_Teodulo Pablo Leger_     DEC 2 0 2005
PAPIO LEGER           (Seal)
         -Borrower

_____ (Seal)          _____ (Seal)
         -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
         -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
         -Borrower                                    -Borrower

VMP-7R (0411)                    Page 3 of 3                    Form 3150 1/01
DDS-C07

BK 07679 PGS 0338-0339 PG(s)2
RECORDED 07/17/2008 04:06:43 PM
RICHARD M WEISS, CLERK OF COURT
POLK COUNTY
RECORDING FEES 18.50
RECORDED BY L Withem

Recording Requested By:
HSBC MORTGAGE SERVICES

When Recorded Return To:

ASSIGNMENTS
HSBC MORTGAGE SERVICES
577 LAMONT ROAD
ELMHURST, IL 60126

ENRICO G. GONZALEZ, PA
6255 EAST FOWLER AVENUE
TEMPLE TERRACE, FL 33617

### CORPORATE ASSIGNMENT OF MORTGAGE

Polk, Florida
SELLER'S SERVICING # ████ "SANTIAGO"

MERS #: ████ VRU #: 1-888-679-6377

Date of Assignment: July 14th, 2008
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR WILMINGTON FINANCE, A DIVISION OF AIG FEDERAL SAVINGS BANK "ITS SUCCESSORS AND ASSIGNS" at 1595 SPRING HILL RD, STE 310, VIENNA, VA 22182
Assignee: HSBC MORTGAGE SERVICES , INC at 577 LAMONT ROAD, ELMHURST, IL 60126
Executed By: MIRIAM SANTIAGO AND TEODULO PABLO LEGER, WIFE AND HUSBAND To: WILMINGTON FINANCE, A DIVISION OF AIG FEDERAL SAVINGS BANK
Date of Mortgage: 12/20/2005 Recorded: 01/06/2006 in Book/Reel/Liber: 06576 Page/Folio: 1368-1391 as Instrument No.: 2006004287 in Polk, Florida

Property Address: 416 BRAYTON LANE, DAVENPORT, FL 33897

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN AND NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of $171,442.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR WILMINGTON FINANCE, A DIVISION OF AIG FEDERAL SAVINGS BANK "ITS SUCCESSORS AND ASSIGNS"
On July 14th, 2008

By: _____
B. E. Smith, Vice- President

WITNESS                                    WITNESS

_____              _____
JoAnn Wilcox                               Deloris Missick

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Illinois
COUNTY OF Cook

On July 14th, 2008, before me, GLORIA E BENSON-COLEMAN, a Notary Public In and for Cook In the State of
Illinois, personally appeared B. E. Smith, Vice- President, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

GLORIA E BENSON-COLEMAN
Notary Expires: 09/19/2011  #683194

```
OFFICIAL SEAL
GLORIA E BENSON-COLEMAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/19/11
```
(This area for notarial seal)

Prepared By:
Nadia Moreno,  HSBC MORTGAGE SERVICES 577 LAMONT ROAD, ELMHURST, IL  60126 630-617-7000

# ADJUSTABLE RATE NOTE

### (LIBOR Index - Rate Caps)

SEE 'INTEREST-ONLY ADDENDUM' ATTACHED HERETO AND MADE A PART HEREOF.

Loan Number: ▮▮▮▮
MIN: ▮▮▮▮

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

December 20, 2005      WINTER PARK      FLORIDA
[Date]      [City]      [State]

416 BRAYTON LANE
DAVENPORT, FL 33897-

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 171,442.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Wilmington Finance, a division of AIG Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.990%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on February 01, 2006 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 01, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PO Box 209 Plymouth Meeting, PA 19462 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,141.52 . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

WILMINGTON - MODIFIED
MULTISTATE ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family - Freddie Mac UNIFORM INSTRUMENT      Form 3590 1/01
Amended for Florida

VMP®-815N(FL) (0005)

VMP MORTGAGE FORMS - (800)521-7291

Initials: _____

Page 1 of 4

DDS-FAY

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of                January, 2008                , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN AND 740/1000                percentage points (                7.740%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than                10.990% or less than                7.990%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than                13.990%, or less than 7.990%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3590  1/01

Initials: _____



## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder
Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:



-815N(FL) (0005)

DDS-FAY

Page 3 of 4

Form 3520 1/01

Initials: _____

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)         _____ (Seal)
MIRIAM SANTIAGO                  -Borrower                                          -Borrower

_____ (Seal)         _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Seal)         _____ (Seal)
                                 -Borrower                                          -Borrower

_____ (Seal)         _____ (Seal)
                                 -Borrower                                          -Borrower

*[Sign Original Only]*



-815N(FL) (0008)                      Page 4 of 4                          Form 3590 1/01
DDS-FAY

## INTEREST-ONLY ADDENDUM
### ADJUSTABLE RATE NOTE

LOAN NO.: ███████

THIS INTEREST-ONLY ADDENDUM is made this    20th    day of December, 2005                ,
and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") and the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure the Note to
Wilmington Finance, a division of AIG Federal Savings Bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
416 BRAYTON LANE
DAVENPORT, FL 33897-
**THIS ADDENDUM SUPERSEDES Section 3(A) and (B) of the Note. None of the other provisions of the note are
changed by this addendum.**

**3.     PAYMENTS**

**(A)     Time and Place of Payments**

I will pay interest by making payments every month for the first    60    payments (the "Interest-Only Period")
in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month
thereafter for the next   300    payments in an amount sufficient to fully amortize the outstanding principle balance of the
Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payment on the 1st day of each month beginning      February 01, 2006      . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below
that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to
interest before principal. If, on        January 01, 2036          , I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date".

I will make my payments at   Wilmington Finance, a division of AIG Federal Savings Bank
                             PO Box 209
                             Plymouth Meeting, PA 19462
or at a different place if required by the Note Holder.

**(B)     Amount of My Initial Monthly Payments**

Each of my initial interest-only monthly payments will be in the amount of US $ 1,141.52        . This amount
may change.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest-Only
Addendum.

_Miriam Santiago_____ (Seal)        _____ (Seal)
MIRIAM SANTIAGO                    -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                                   -Borrower                                      -Borrower

DDS-HAJ                                                                          (08/02)

 

Loan No.: ██████

| Creditor: | Program Name: | INT. ONLY 2/6 MO LIBOR ARM |
|---|---|---|
| Wilmington Finance, | | First 5 Years Interest-Only Payments |
| a division of AIG Federal Savings Bank | | Fixed for 2 Years |
| 401 Plymouth Road, Suite 400 | | 6 Month ARM thereafter |
| Plymouth Meeting, PA 19462 | | 6 Month LIBOR Index |
| | | 3/1/6% Caps |

## VARIABLE RATE MORTGAGE PROGRAM DISCLOSURE

This variable rate loan program disclosure describes the features of the adjustable rate mortgage ("ARM") program you are considering. Information on other ARM programs is available upon request. This is neither a contract nor a commitment to lend. If you do obtain a loan from the Lender, the Note, Security Instrument and related documents will establish your legal rights and obligations.

Because the Lender may sell any loan it makes, the purchaser of the loan ("Noteholder") may enforce the terms of any loan obtained from the Lender. You will be required to make payments to the Noteholder or a Servicer the Noteholder designates. For purposes of easy reference, the term Lender is used below and refers to the initial Lender or purchaser of the Note.

### HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- Your interest rate will be based on an index rate plus a margin.
- During the period that you make payments of interest only, your payments will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.
- The index upon which the interest rate will be based is the yearly average of interbank offered rate for six-month U.S. Dollar denominated deposits in the London market ("LIBOR").
- Information about the current index is published in the Wall Street Journal.
- This ARM loan may have a discount feature, and your initial interest rate may not be based on the index used to make later adjustments. Ask about our current discount rate.
- Your interest rate will equal the index rate plus your margin unless your interest rate "caps" limit the amount of change in the interest rate.
- During the first five (5) years, interest only payments will be required to be made. This means that the regular monthly payments will not reduce the principal balance during the first five (5) years of your loan.
- Beginning in year six (6), the payment will be amortized over the remaining term and applied towards principal and interest.

### HOW YOUR INTEREST RATE CAN CHANGE

- Your interest rate can change every 6 months beginning approximately 2 years after your loan closes. These are known as the "Change Dates".
- Your new interest rate will be equal to the sum of the margin and the index value published on the first business day of the month in the month prior to the Change Date subject to the restrictions described below.
- Your interest rate cannot increase or decrease more than three percentage points (3.000%) at the first adjustment (a "cap").
- Your interest rate cannot increase or decrease more than one percentage point (1.000%) at each adjustment thereafter (a "cap").
- Your interest rate will not decrease below the initial interest rate.
- Your interest rate can never increase by more than six percentage points (6.000%) above the start rate (a "cap").
- Your interest rate will be rounded to the nearest 0.125% at each adjustment.

 

**HOW YOUR MONTHLY PAYMENT CAN CHANGE**

- Your monthly payment can increase or decrease substantially every 6 months beginning approximately 2 years after your loan closes based on changes to the interest rate. You will begin making your new monthly payments on the first payment due date after each Change Date.
- At each Change Date, the lender will recalculate your monthly payment based on an amount necessary to fully repay the remaining loan balance at the new interest rate on the maturity date in substantially equal monthly payments.
- At each Change Date, the lender will recalculate your monthly payment based on an amount necessary to fully repay the remaining loan balance at the new interest rate on the maturity date in substantially equal monthly payments.
- At each Change Date during the interest-only period the lender will recalculate your monthly payment to be an amount necessary to fully repay the accrued interest at the then current interest.
- If you make a voluntary prepayment of principal during the interest-only period, your payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.
- At each Change Date after the interest-only period, the lender will recalculate your monthly payment based on an amount necessary to fully repay the unpaid principal balance at the then current interest rate on the maturity date in substantially equal monthly payments.
- You will be notified in writing at least 25 calendar days before the monthly adjustment is made. This notice will contain information about your index, interest rate, payment amount and loan balance.
- For example, on a new $10,000, 30 year loan with an initial interest rate of 5.49% in effect in December 2002, the maximum amount that the interest rate could rise under this example is 11.49%, and the payment amount could rise from a beginning payment of $45.75 to a maximum of $95.75 in 3 1/2 years based on an interest-only payment during the 3 1/2 years. You will begin making monthly payments of principal and interest in the 6th year. (For example, the monthly payment for a mortgage amount of $60,000/$10,000 = 6; 6 x $45.75 = $274.50) To compute the above example we used a margin value and interest rate we have used recently. Your margin value and interest rate may be different and you should ask about what is the current margin value and interest rate.

I/We hereby acknowledge receipt of this variable rate program disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.

| MIRIAM SANTIAGO | | |
|---|---|---|
| (Date) | | (Date) |

| | | |
|---|---|---|
| (Date) | | (Date) |

 

Loan No.: ▮▮▮▮▮

| Creditor: | Program Name: INT. ONLY 2/6 MO LIBOR ARM |
|---|---|
| Wilmington Finance, a division of AIG Federal Savings Bank 401 Plymouth Road, Suite 400 Plymouth Meeting, PA  19462 | First 5 Years Interest-Only Payments Fixed for 2 Years 6 Month ARM thereafter 6 Month LIBOR Index 3/1/6% Caps |

## VARIABLE RATE MORTGAGE PROGRAM DISCLOSURE

This variable rate loan program disclosure describes the features of the adjustable rate mortgage ("ARM") program you are considering. Information on other ARM programs is available upon request. This is neither a contract nor a commitment to lend. If you do obtain a loan from the Lender, the Note, Security Instrument and related documents will establish your legal rights and obligations.

Because the Lender may sell any loan it makes, the purchaser of the loan ("Noteholder") may enforce the terms of any loan obtained from the Lender. You will be required to make payments to the Noteholder or a Servicer the Noteholder designates. For purposes of easy reference, the term Lender is used below and refers to the initial Lender or purchaser of the Note.

### HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED
- Your interest rate will be based on an index rate plus a margin.
- During the period that you make payments of interest only, your payments will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.
- The index upon which the interest rate will be based is the yearly average of interbank offered rate for six-month U.S. Dollar denominated deposits in the London market ("LIBOR").
- Information about the current index is published in the Wall Street Journal.
- This ARM loan may have a discount feature, and your initial interest rate may not be based on the index used to make later adjustments. Ask about our current discount rate.
- Your interest rate will equal the index rate plus your margin unless your interest rate "caps" limit the amount of change in the interest rate.
- During the first five (5) years, interest only payments will be required to be made. This means that the regular monthly payments will not reduce the principal balance during the first five (5) years of your loan.
- Beginning in year six (6), the payment will be amortized over the remaining term and applied towards principal and interest.

### HOW YOUR INTEREST RATE CAN CHANGE
- Your interest rate can change every 6 months beginning approximately 2 years after your loan closes. These are known as the "Change Dates".
- Your new interest rate will be equal to the sum of the margin and the index value published on the first business day of the month in the month prior to the Change Date subject to the restrictions described below.
- Your interest rate cannot increase or decrease more than three percentage points (3.000%) at the first adjustment (a "cap").
- Your interest rate cannot increase or decrease more than one percentage point (1.000%) at each adjustment thereafter (a "cap").
- Your interest rate will not decrease below the initial interest rate.
- Your interest rate can never increase by more than six percentage points (6.000%) above the start rate (a "cap").
- Your interest rate will be rounded to the nearest 0.125% at each adjustment.

DDS-ACV                         Page 1 of 2                              (04/03).1



## HOW YOUR MONTHLY PAYMENT CAN CHANGE

- Your monthly payment can increase or decrease substantially every 6 months beginning approximately 2 years after your loan closes based on changes to the interest rate. You will begin making your new monthly payments on the first payment due date after each Change Date.
- At each Change Date, the lender will recalculate your monthly payment based on an amount necessary to fully repay the remaining loan balance at the new interest rate on the maturity date in substantially equal monthly payments.
- At each Change Date, the lender will recalculate your monthly payment based on an amount necessary to fully repay the remaining loan balance at the new interest rate on the maturity date in substantially equal monthly payments.
- At each Change Date during the interest-only period the lender will recalculate your monthly payment to be an amount necessary to fully repay the accrued interest at the then current interest.
- If you make a voluntary prepayment of principal during the interest-only period, your payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.
- At each Change Date after the interest-only period, the lender will recalculate your monthly payment based on an amount necessary to fully repay the unpaid principal balance at the then current interest rate on the maturity date in substantially equal monthly payments.
- You will be notified in writing at least 25 calendar days before the monthly adjustment is made. This notice will contain information about your index, interest rate, payment amount and loan balance.
- For example, on a new $10,000, 30 year loan with an initial interest rate of 5.49% in effect in December 2002, the maximum amount that the interest rate could rise under this example is 11.49%, and the payment amount could rise from a beginning payment of $45.75 to a maximum of $95.75 in 3 1/2 years based on an interest-only payment during the 3 1/2 years. You will begin making monthly payments of principal and interest in the 6th year. (For example, the monthly payment for a mortgage amount of $60,000/$10,000 = 6; 6 x $45.75 = $274.50) To compute the above example we used a margin value and interest rate we have used recently. Your margin value and interest rate may be different and you should ask about what is the current margin value and interest rate.

I/We hereby acknowledge receipt of this variable rate program disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.


MIRIAM SANTIAGO                         DEC 2 0 2005 _____
                                          (Date)                                        (Date)



_____                  _____
           (Date)                                        (Date)


DDS-ACV                                   Page 2 of 2                                   (04/03).1